IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANE DOE, by next friend, MICHELLE          Hon. _____
HOFFMAN,

        Plaintiff,                          Case No. _____

    v.

HOLLAND CHRISTIAN EDUCATION SOCIETY
DBA HOLLAND CHRISTIAN SCHOOLS,

        Defendant.

Karen Truszkowski (P56929)           Julie A. Jacot (P43443)
Temperance Legal Group PLLC           Jacot Law PLLC
503 Mall Court #131                   1044 N. Irish Road, Ste A
Lansing, MI  48912                    Davison, MI  48423
844-534-2560 phone                    810-653-9526 phone
800-531-6527 fax                      810-658-2444 fax
Karen@temperancelegalgroup.com        juliejacotlaw@gmail.com

**<u>COMPLAINT AND JURY DEMAND</u>**

      Plaintiff, JANE DOE by next friend MICHELLE HOFFMAN, by and through her

attorneys, KAREN TRUSZKOWSKI and JULIE A. JACOT, hereby files the following complaint

against Defendant as captioned above.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2.     This Court has supplemental jurisdiction over claims arising under state law pursuant to 28 U.S.C. § 1367(a).

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because the events giving rise to this claim occurred in this judicial district, and because Defendant is located in this judicial district.

## THE PARTIES

4.     Plaintiff was, at all material times, a student at Holland Christian Schools.

5.     Defendant, Holland Christian Education Society dba Holland Christian Schools ("Holland Christian") is a private school receiving federal funds.  Specifically, at all material times, Holland Christian received federal financial assistance via the National School Lunch Program (CFDA No. 10.555) administered by the United States Department of Agriculture (USDA).

## APPLICABLE LAW AND POLICY

6.     Holland Christian receives federal financial assistance and is, therefore, subject to the dictates of Title IX. See *Russo v. Diocese of Greensburg, et. al., Memorandum and Order, Sept. 15, 2010, United States District Court for the Western District of Pennsylvania, Civil Action No. 09-1169*, **EXHIBIT A.**

7.     Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . .

8.      Title IX is implemented through the Code of Federal Regulations.  See 34 C.F.R. Part 106.

9.      34 C.F.R § 106.8(b) provides:

> . . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

10.     In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

11.     In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the United States Supreme Court extended the private damages action recognized in *Gebser* to cases where the harasser is a student.

12.     *Davis* held that a complainant may prevail in a private Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is:

> a) deliberately indifferent to sexual harassment of which the recipient has actual knowledge, and

> b) the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

> *Davis*, 526 U.S. at 1669-76.

## BACKGROUND FACTS RELEVANT TO ALL COUNTS

13.     The Office of Civil Rights ("OCR"), a division of the United States Department of Education ("DOE"), is responsible for the implementation, interpretation, and enforcement of Title IX.

14.     The OCR has promulgated numerous documents outlining the requirements for an educational institution to be in compliance with Title IX, including the Dear Colleague

Letter of April 4th, 2011 ("DCL"), which specifically concerns peer-on-peer sexual harassment and sexual assault.

15. At the time of the events set forth in this Complaint, the April 4th, 2011 Dear Colleague Letter was in effect and applicable to said events.[1]

16. The DOE was authorized by Congress, pursuant to 20 U.S.C.A. § 1682, to promulgate regulations to govern the implementation, interpretation and enforcement of Title IX.

17. The DCL is a "significant guidance document," intended to provide educational institutions with clarity as to the requirements they must follow in order to be in compliance with the DOE. Pursuant to 72 Fed. Reg. 3432, a "guidance document" is "an agency statement of general applicability and future effect, other than a regulatory action…that sets forth a policy on a statutory, regulatory, or technical issue or an interpretation of a statutory or regulatory issue." A "significant guidance document" is "a guidance document disseminated to regulated entities or the general public that may reasonably be anticipated to… (iv) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in Executive Order 12866, as further amended."

18. The DCL specifically outlines the requirements that educational institutions must follow regarding peer-on-peer sexual harassment and assault.

19. A failure to adhere to the requirements outlined in the DCL could result in the loss of federal funding for an educational institution.

20. The DCL states that "Schools are required to publish a notice of nondiscrimination and to adopt and publish grievance procedures."

---

[1] Current Secretary of Education Betsy DeVos has since rescinded the Dear Colleague Letter, although it was in effect during the events described in the within complaint.

21.    The DCL also requires that school "employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly."

22.    The DCL requires that a school identify the name, title and contact information of the person designated to coordinate the school's compliance with Title IX. This coordinator is responsible for overseeing all Title IX complaints. This coordinator should not have any other job responsibilities that may create a conflict of interest. Further, the school must ensure that this coordinator has adequate training on Title IX.

23.    The DCL also notes that "If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures." In other words, a school is responsible for processing complaints of student-on-student harassment or assault, even if it occurs off campus, because "students often experience the continuing effects of off-campus conduct in the educational setting…"

24.    Further, the DCL states that a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate a claim of assault.

25.    The DCL states, Title IX requires that the school's inquiry into peer-on-peer sexual harassment and assault "must be prompt, thorough, and impartial."

26.    The DCL requires the school to "tell the complainant that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also strong responsive action if it occurs."

27.    As to any potential conflicts of interest, the DCL states, "a school's investigation and hearings processes cannot be equitable unless they are impartial. Therefore, any real or

perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed."

28. The DCL requires designated and reasonably prompt timeframes for investigation and resolution. Per the DCL, "Based on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint."

29. In addition to resolving complaints promptly, the DCL also addresses OCR recommendations regarding the use of preventive education programs and comprehensive victim services. Per the DCL, such education and training may be included in "orientation programs for new students, faculty, staff, and employees."

30. The DCL also outlines OCR recommendations regarding complainant safety. The DCL states, "Title IX requires a school take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should take these steps promptly once it has notice of a sexual harassment or violence allegation." The DCL continues, "When taking steps to separate the complainant and alleged perpetrator, a school should minimize the burden on the complainant, and thus should not, as a matter of course, remove complainants from classes or housing while allowing alleged perpetrators to remain."

31. The DCL specifically addresses retaliation, stating, "Schools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates. For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting. As part of their Title IX obligations, schools must have policies and procedures in place to protect against retaliatory harassment."

## COMMON ALLEGATIONS

32.    During the 2015-16 school year, Plaintiff, a 15-year-old female, was a student at Holland Christian High School.  "BJD," a 17-year-old male, was also a student at Holland Christian High School.

33.    In November, 2015, Plaintiff and BJD began a romantic relationship but kept this relationship from their parents because Plaintiff was not allowed to date until she was 16-years-old.

34.    Plaintiff's parents learned of the relationship in late December, 2015/early January, 2016.

35.    In February, 2016, Plaintiff's parents noticed Plaintiff becoming depressed, anxious, and isolating herself from family and friends.

36.    Plaintiff's mother caught Plaintiff texting and talking with BJD several times in the early hours of the morning.  This resulted in Plaintiff's phone being taken away.

37.    Plaintiff's parents later learned that BJD had given Plaintiff another communication device so that that two could remain in contact should Plaintiff's parents confiscate her phone, thus subverting her parent's discipline.

38.    Plaintiff's parents felt that BJD exhibited "over the top" behavior towards Plaintiff.  BJD sent Plaintiff so many gifts and flowers that Plaintiff's parents felt it to be inappropriate.

39.    Plaintiff's mother began to periodically monitor Plaintiff's phone and soon discovered that BJD was pressuring Plaintiff to have sex.

40.    Plaintiff's mother talked with her daughter about this, telling her that any boy who cared about her would respect her and not pressure her for sex.

41.    On May 21, 2016, upon reviewing her daughter's phone, Plaintiff's mother discovered a terribly mean, abusive message from BJD to Plaintiff.

42.     Plaintiff's mother sent a response to BJD stating that she was Plaintiff's mother, that BJD had no right to talk to her daughter as he did and that Plaintiff's mother was going to contact BJD's mother.

43.     Within five minutes of receiving Plaintiff's mother's text, BJD sent Plaintiff a text breaking up with her.

44.     Plaintiff, her mother and BJD's mother met Memorial Day weekend 2016.  BJD's mother told Plaintiff's mother that BJD had previously been in counseling and that she and her husband were thinking of putting BJD back into counseling due to some "concerning manipulative" behavior.

45.     Plaintiff's mother asked BJD's mother to review the communications between the two students.[2]

46.     By the time BJD's mother returned home, BJD had deleted all the communications.

47.     Thus, Plaintiff's mother learned how to recover deleted texts and Google Doc messages and, as she recovered communications, she learned more and more about BJD and Plaintiff's relationship.

48.     It was clear that the relationship was a toxic one, with BJD heaping abuse upon Plaintiff.

49.     As she recovered communications, Plaintiff's mother forwarded them to BJD's mother. BJD's mother was shocked to see the content of the texts.

50.     Throughout their relationship, BJD used manipulative techniques to gain Plaintiff's sympathy in an effort to control her.  BJD told Plaintiff that his mother was a "bitch," that his mother was controlling, that his family was abusive, and that his family told him to kill himself.

---

[2] Other than phone conversations, the two students routinely communicated via phone texts and Google messages.

8

51.    BJD threatened to commit suicide and cut himself if Plaintiff tried to break up with him.

52.    BJD also told Plaintiff that she should kill herself.

53.    About a week after the Memorial Day meeting with BJD's mother, Plaintiff's mother discovered a message from BJD to Plaintiff in which BJD apologized for forcing Plaintiff to have sex, he referred to the incident as "rape."

54.    Though Plaintiff's parents attempted to talk to her, Plaintiff was in emotional pain and, at that point, was not ready to discuss what happened.

55.    BJD's parents agreed to keep BJD away from Plaintiff and agreed to have his home room changed because the two students were in the same home room.

56.    Plaintiff's parents also called Holland Christian's Dean of Students David DeBoer, (DEBOER), explaining the abusive relationship and asked that Plaintiff be allowed to take her final examinations alone at an undisclosed location. DEBOER granted this request.

57.    DEBOER asked if the abuse included criminal behavior and Plaintiff's mother replied that it was possible but did not specify any further because they had not yet been able to talk with their daughter about what had happened.

58.    Plaintiff had "clammed up," was not talking, and she was not ready to share with her family. Given her emotional state, Plaintiff's parents did not want to "push" Plaintiff until she was ready to tell them what had occurred.

59.    The 2015-2016 school year concluded.

60.    In August, 2016, at the beginning of the 2016-2017 school year, even with her family's supportive environment, Plaintiff still had not revealed what had taken place with BJD.

61.     However, once school started, Plaintiff felt comfortable talking with one of her teachers, Jamie Slenk.  (SLENK).  Plaintiff revealed to SLENK that BJD had raped her.  SLENK,

under the mistaken impression that Plaintiff's parents were not addressing the situation, reported the situation to Child Protective Services ("CPS") wherein Plaintiff's family came under investigation, adding additional stress to the family.

62.   With the commencement of the CPS investigation, CPS told Plaintiff's parents that Plaintiff revealed to SLENK that she had been raped by BJD.

63.   Upon asking Plaintiff about this, Plaintiff confirmed to her parents that BJD had raped her.[3]

64.   After learning of the sexual assault, Plaintiff's parents were in constant communication with Principal Darryl De Ruiter, (DE RUITER), teacher Erika Blom, (BLOM), and counselor Karen Jefts, (JEFTS), in an effort to ensure their daughter's safety.

65.   Plaintiff's mother initially communicated with DE RUITER but became so frustrated with his refusal to protect her daughter, that she eventually began talking to Superintendent Daniel Meester (MEESTER) instead.

66.   Plaintiff's parents communicated their concerns and requests via in person meetings, phone calls, and emails over the entire 2016-17 school year.

67.   After learning that school board members were not aware of the situation with BJD, Plaintiff's mother emailed all board members, notifying them of the rape, of

      DE RUITER and MEESTER'S refusal to protect their daughter from BJD and of their refusal to impose any discipline against BJD.

68.   The school board president responded that the school board would not interfere, that the decisions were up to DE RUITER and MEESTER.

69.   Despite Plaintiff's parents' requests, and despite knowing of the rape allegations, the school did nothing to separate BJD from Plaintiff.

---

[3] The rape occurred on May 20, 2016.

70.     In fact, DE RUITER minimized the rape, stating it was just "underaged sex."

71.     DE RUITER also said that unless BJD was charged with a crime, the school could not do anything.

72.     Holland Christian imposed no discipline at all on BJD, despite BJD's clear violations of the school code.[4]

73.     Plaintiff was diagnosed with Post-Traumatic Stress Disorder, depression, and anxiety. Plaintiff attended therapy and was prescribed medication.  Plaintiff missed school due to anxiety, crying jags, and overwhelming emotional crises.  Plaintiff had difficulty focusing on her studies and her grades suffered.

74.     Plaintiff's mother told DE RUITER repeatedly that Plaintiff was not doing well academically.

75.     DE RUITER refused to acknowledge that Plaintiff was having academic difficulty, stating that her grades seemed fine even though Plaintiff's mother explained that Plaintiff struggled every night with her studies and that she had difficulty focusing.

76.     At one point, Plaintiff received three F's in one class because she was struggling so much. With her parents' assistance, however, Plaintiff managed to bring her grade up but this was very hard for her given her emotional stress and difficulty focusing.

77.     Trying to keep her GPA up was an on-going struggle for Plaintiff throughout the school year.

78.     Plaintiff's mother told DE RUITER that Plaintiff was not doing well emotionally.

---

[4] Oddly enough, the HCS Student Handbook and Community Code did not contain any mention of sexual assault as violative conduct.  The handbook did, however, include verbal bullying, physical bullying, and psychological bullying as violations of student conduct.

79.    Plaintiff was traumatized just by knowing she might see BJD, and in fact, she did have to see him at school.

80.    The two student's classes were in close proximity, either in the same hall or in adjacent rooms.

81.    Thus, Plaintiff saw BJD each time classes changed, leaving class or going to class.

82.    BJD deliberately made sure he was either in front of Plaintiff or right behind her; he kept in close proximity to her and made sure she was aware of it.

83.    One time, BJD brushed up very close to Plaintiff and said something to her.

84.    Plaintiff froze, was unable to move and she became so terrified that she did not comprehend what BJD had said to her.

85.    Further, BJD and Plaintiff were both in choir class and BJD was a member of a singing group called Living Hope.[5]  School policy mandated that a student must participate in choir class in order to participate in Living Hope.

86.    This meant that BJD and Plaintiff would both be in choir at the same time.

87.    Being in choir with BJD caused Plaintiff extreme fear and anxiety.

88.     Plaintiff's mother met with BLOM to discuss Plaintiff's anxiety and fear caused by having to be in choir class with BJD.

89.    BLOM stated she noticed that Plaintiff always walked into choir class surrounded by a group of girls.

90.    Plaintiff's mother told BLOM that Plaintiff made sure to do this because Plaintiff was afraid of BJD and afraid of walking into the class alone.

---

[5] Living Hope Holland Christian's traveling singing group is made up of "select members" of junior and senior choir members.

91.    In an effort to protect her daughter, Plaintiff's mother asked if the choir requirement could be waived so that BJD could be in Living Hope without having to be in choir with Plaintiff.

92.    BLOM, and later DE RUITER, told Plaintiff's mother that this requirement could not be waived.

93.    Even though Plaintiff loved choir, she eventually dropped the class, so she would not have to see or be near BJD.

94.    BJD could roam freely at Holland Christian, allowing him to approach Plaintiff, attend the same choir class, navigate the hallways, cafeteria, and library, as well as extra-curricular events, sporting events, etc.

95.    The situation became so problematic that Plaintiff's parents hired legal counsel in an effort to resolve the issue. This letter pointed out that BJD's behavior was not only a violation of Michigan law but also constituted several violations of the Holland Christian Student Handbook and Community Code.  The letter requested that BJD be removed from the school.  **EXHIBIT B.**

96.    Even though BJD admitted to raping Plaintiff, Holland Christian nevertheless continued to allow BJD to attend school with no repercussions or restrictions.

97.    DE RUITER defended this position stating that the school "was not taking sides" and was treating both students "equally."

98.    DE RUITER'S position was completely contrary to Title IX regulations and, moreover, traumatizing to Plaintiff, the victim.

99.    Under Title IX, it is incumbent upon a school to treat assault allegations as true pending an investigation and, during that pendency, to implement protections and accommodations for the victim.

100.   Holland Christian failed to commence an internal investigation, failed to implement protections, failed to provide accommodations for Plaintiff, and failed to have any Title IX policy whatsoever.

101.   Holland Christian ignored the letter from the Hoffman's attorney and continued to subject Plaintiff to her rapist's presence every school day and at extra-curricular events.

102.   Plaintiff stopped attending extra-curricular events and other school activities because she was so afraid of running into BJD.

103.   Plaintiff's brother, JH, was a senior and long-time football player who started for the Holland Christian football team.

104.   Plaintiff's entire family attended every football game to cheer JH on.

105.   BJD, who had never shown any interest in football, suddenly signed up to be a kicker on the team.

106.   Plaintiff's mother found out about this and contacted DE RUITER and Athletic Director David Engbers (ENGBERS), requesting that they not allow BJD to play on the team.

107.   Plaintiff's mother explained that Plaintiff attended all of her brother's games and was afraid to see BJD or run into him.

108.   DE RUITER and ENGERS refused the request.

109.   Thus, Plaintiff ceased attending her brother's football games because Holland Christian refused to take any action to protect Plaintiff.[6]

110.   Yet again, Holland Christian chose to ignore the needs of the victim over the rapist.

---

[6] Once again, BJD employed a manipulative technique to be in proximity to Plaintiff as well as her family.  BJD knew Plaintiff brother was on the team and knew Plaintiff always attended his games.  During the games, BJD would stand behind JH on the sidelines, if JH moved, so too did BJD, standing directly behind JH.  This behavior was deliberate and intended to irritate and cause discomfort.

111.   Meanwhile, Plaintiff's parents had contacted the local police and a criminal investigation commenced.  The initial investigating detective knew BJD's family and did not formally interview BJD or pursue the investigation.  Eventually, with Plaintiff's parents contacting the police chief and with a new prosecutor being appointed, BJD was charged with Third-Degree Criminal Sexual Conduct (CSC 3rd degree).

112.   On December 6, 2016, BJD was arraigned in the 58th Judicial Court and pled guilty to CSC 3rd degree.

113.   The Judge released BJD on a conditional bond, ordering that BJD was "[n]ot to be on premises of Holland Christian High School."

114.   Incredulously, DE RUITER interpreted this order to mean that BJD could not be on school grounds as "long as [Plaintiff] is not there."

115.   Plaintiff's mother contacted the prosecutor's office who instructed DE RUITER as to the clear meaning of the order.

116.   Due to the conditional order, BJD could no longer attend classes at Holland Christian.

117.   Because choir teacher and Living Hope Director BLOM wanted BJD to continue as a member of Living Hope, Holland Christian waived its mandatory choir requirement, allowing BJD to participate in Living Hope without having to attend choir class.

118.   This was an accommodation Holland Christian had flatly refused to provide to Plaintiff.

119.   Once again, Holland Christian chose to accommodate the rapist rather than the victim.

120.   Following BJD's conviction, Holland Christian still did not expel BJD nor discipline him in any way despite DE RUITER's prior claim that the school could not take action unless BJD was charged.

121. Instead, the school provided him with every possible accommodation, even sending teachers to his home to tutor him so he could finish his senior year.

122. BJD was sentenced on the CSC conviction on February 20, 2017.

123. Before his sentencing, several Holland Christian staff members wrote letters to the presiding Judge on BJD's behalf, asking for leniency, stating BJD was a "good kid," that BJD could be trusted, and imploring the Judge to allow BJD to continue in Living Hope.[7]

124. Not one member of the school's staff wrote in support of Plaintiff.

125. This sent Plaintiff and her family a clear message that Holland Christian believed Plaintiff's pain, trauma and schooling were irrelevant.

126. Plaintiff had to face each day knowing that the authority figures at her school supported her rapist, and not her.

127. BJD'S sentencing (along with his prior plea and conviction) was covered by the local media.

128. After BJD's sentencing, Plaintiff and her mother composed an email, which Plaintiff then sent to the female members of Living Hope advising them of BJD's conviction and sentence.

129. The email explained that Holland Christian was aware of the events but nevertheless continued to allow BJD on school grounds and to participate in Living Hope.

130. Some parents of Living Hope members were outraged that they had not been notified of BJD's criminal conduct and that he had not been suspended or expelled and was allowed to participate in Living Hope.

---

[7] These staff members were:  Principal Darryl De Ruiter, Dean David DeBoer, Choral Director Erika Blom, Athletic Director David Engbers, and Teacher Kevin Koeman.

131.  Choir teacher and Living Hope director BLOM, who also wrote a letter of support on BJD's behalf, found out about the email.

132.  Instead of supporting Plaintiff, BLOM confronted Plaintiff, telling Plaintiff that she had no right sending such an email without BLOM'S authority.

133.  BLOM accused Plaintiff of creating diversity among the Living Hope group.

134.  Plaintiff, the victim, was vilified by a Holland Christian authority figure.

135.  At sentencing, because of the five Holland Christian letters sent in support of BJD, the criminal Judge ordered that BJD could participate in Living Hope and could attend Living Hope practices at Holland Christian High School from 3:30-4:30pm[8] each Wednesday.

136.  Living Hope practice took place in the choir room near the North entrance/exit to the Holland Christian High School.

137.  Plaintiff and her older brother, a senior, parked in the North lot and had always done so. Leaving school on Wednesdays meant that Plaintiff walked directly past the choir room and would likely run into BJD.

138.  Thus, Plaintiff's mother requested that BJD park in a different lot and enter the school from a different door.

139.  School officials refused to have BJD park in a different lot.  MEESTER said BJD would be allowed to use the North parking lot and entrance and that Plaintiff and her brother would have to change where they normally parked and exit through a different door.

140.  Yet again, Holland Christian chose to accommodate the rapist rather than the victim.[9]

---

[8] Plaintiff is not certain of the practice time, it may have been 3:00-4:00pm.
[9] Ultimately, BJD decided to no longer participate in Living Hope though this was after the school made its decision to accommodate BJD rather than Plaintiff.

141.  After his sentencing, Plaintiff's mother contacted BJD's probation officer who told her that BJD would not be attending the senior graduation party.

142.  Plaintiff's brother, JH, planned to attend the senior graduation party.

143.  As they had with yet another older son, Plaintiff's parents volunteered to chaperone JH's senior graduation party.

144.  Tricia Koops, (KOOPS), an administrative secretary at Holland Christian, was an organizer of the senior party.

145.  KOOPS told the Hoffmans they were not needed as chaperones.

146.  KOOPS also informed the Hoffmans that "I [Ms. Koops] am going to do everything in my power to get [BJD] to this party."

147.  KOOPS communicated this to Plaintiff's parents using her Holland Christian email.

148.  Plaintiff's parents later found out that KOOPS accepted BJD's parents as chaperones which is why KOOPS did not want the Hoffmans to chaperone.

149.  Though he was not supposed to attend the party, BJD nevertheless showed up, resulting in Plaintiff's brother leaving the party because he did not want to be in proximity to his sister's rapist.

150.  KOOPS again made it clear that Holland Christian was not neutral, favoring BJD to the detriment of Plaintiff and her family.

151.  Holland Christian was duly notified that Plaintiff was sexually assaulted by BJD, a fellow student.  Holland Christian did not commence an internal investigation, did not advise Plaintiff of her Title IX rights, did not offer Plaintiff counseling, did not offer Plaintiff academic support, did not discipline BJD or restrict his presence from Plaintiff in any way, and did not offer Plaintiff appropriate or adequate accommodations.  Indeed, Holland

18

Christian did not even have a designated Title IX coordinator or have a Title IX policy in place.

152.    Holland Christian did, however, go above and beyond to accommodate the rapist in every way possible, causing the victim additional emotional trauma.

153.    Holland Christian placed the rights of the perpetrator over the safety and well-being of the Plaintiff, demonstrating clear deliberate indifference to Plaintiff and her rights.

154.    Plaintiff suffered sex-based harassment that was pervasive and objectively offensive.

155.    The sex-based harassment deprived Plaintiff of access to the educational opportunities or benefits of the school.

156.    Holland Christian's conduct was such that students in Plaintiffs' circumstances would be chilled from reporting instances of sexual harassment in the future.

157.    As a direct and proximate result of the harassing educational environment created by Holland Christian's deliberately indifferent response to the sexual harassment, Plaintiff suffered psychological damage and emotional distress.

158.    Plaintiff has been deprived of a normal childhood education due to Holland Christian's conduct and the resulting hostile educational environment.

159.    Plaintiff has been damaged by missed educational opportunities and her future earnings capabilities have been damaged by Holland Christian's conduct and the resulting hostile educational environment.

**COUNT 1**
**VIOLATION OF TITLE IX**
**(20 U.S.C. § 1681, *et. Seq.*)**

Paragraphs 1 through 159 are incorporated by reference as if stated in full herein.

160.   The sex-based harassment articulated in Plaintiff's common allegations was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational benefits provided by the school.

161.   Holland Christian created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C § 1681 (a) ("Title IX"), because:

a)  Plaintiff was a member of a protected class;

b)  Plaintiff was subjected to sexual harassment in the form of a sexual assault perpetrated by a fellow student and, after the assault, subjected to harassment in the form of the school not protecting Plaintiff from her rapist by:

   i.   allowing the rapist to attend the same choir class resulting in Plaintiff dropping choir, a class she loved,

   ii.   allowing the rapist to attend classes in close or adjacent proximity to Plaintiff's classes so she had to see him and be in close proximity to him every time classes changed,

   iii.   allowing the rapist to deliberately approach Plaintiff and speak to her, and

   iv.   allowing the rapist to attend extra-curricular events so Plaintiff could not,

c)  Plaintiff was subjected to harassment based on her sex; and

d)  Plaintiff was subjected to a hostile educational environment created by Holland Christian's lack of effective and appropriate policies and procedures to properly prevent, investigate, and address sexual assault and harassment, and failure to protect Plaintiff from her attacker's subjugation and presence.

162.   Holland Christian had actual knowledge of the sexual harassment created by their failure to protect Plaintiff in a timely manner and consistent with federal law.

163.   Holland Christian's failure to promptly and appropriately respond to the sexual harassment resulted in Plaintiff, based on her sex, being excluded from participation in, being denied the benefits of, and being subjected to, discrimination in Holland Christian's education programs and activities in violation of Title IX.

164.   Holland Christian failed to take immediate, effective remedial steps to resolve the complaints of sexual harassment and instead acted with deliberate indifference toward Plaintiff.

165.   Holland Christian persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Plaintiff.

166.   Holland Christian engaged in a pattern and practice of behavior designed to discourage and dissuade students who had been sexually harassed, and parents of these students, from seeking assistance and protection.

167.   This policy constitutes disparate treatment of female students and has a disparate impact on female students.

168.   Holland Christian does not have even minimal compliance with Title IX for the following reasons:

   a.   Holland Christian has no designated Title IX Coordinator

   b.   Holland Christian has no Title IX policies or procedures

   c.   Holland Christian does not conduct Title IX investigations

   d.   Holland Christian provides no training in Title IX policies and procedures to its staff, faculty, or students

e.  Holland Christian has no designated reporting procedure for gender-based

harassment complaints

169.  Plaintiff has suffered emotional distress, psychological damages, physical manifestation

of psychological distress, humiliation, loss of self-esteem, loss of enjoyment of life, loss

of future earnings, and past and ongoing medical expenses as a direct and proximate

cause of Defendants' deliberate indifference to her rights under Title IX.

**COUNT II – PENDENT STATE CLAIM**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Paragraphs 1 through 169 and its subparts are incorporated by reference as if stated in full

herein.

170.  Defendant deliberately supported the perpetrator.  Five of defendant's employees wrote

letters on BJD's behalf to the Judge overseeing BJD's criminal conviction for CSC 3rd,

completely disregarding the devastating impact this would have on Plaintiff, the victim.

171.  Defendant deliberately refused to protect Plaintiff from her rapist.  Even after learning of

the criminal rape allegation, Defendant refused to suspend or expel BJD or take any

disciplinary measures whatsoever, allowing BJD to freely access any part of the school.

172.  This resulted in Plaintiff having to see her rapist every day at school, having him follow

her, brush up against her, whisper to her, and terrorize her.

173.  Defendant also allowed BJD to attend extra-curricular activities even though Plaintiff's

parents had asked that he not be allowed to do so.

174.  Thus, Plaintiff did not attend such activities denying her the opportunity to socialize and

enjoy such events as a normal teenager would have done.

175.   Defendant, a school whose premise is to provide an education based on Christian principles, chose to ignore the agony of a rape victim in favor of the rapist, while providing the rapist with accommodations to continue his education.

176.   Even after the Judge in the criminal matter ordered that BJD was not to be on school grounds, Defendant deliberately refused to protect Plaintiff from her rapist.

177.   Once BJD was charged and pled guilty to CSC 3rd degree, Holland Christian again refused to suspend him or expel him or impose any disciplinary measures whatsoever.

178.   Holland Christian allowed BJD to attend all off campus extra-curricular events.

179.   Holland Christian chose to accommodate BJD by sending tutors to his home while flagrantly disregarding Plaintiff 's academic difficulties.

180.   Defendant failed to notify Plaintiff of her Title IX rights, failed to provide any protections or accommodations, and failed to conduct an internal investigation, all in violation of federal law.

181.   Defendant's conduct was extreme and outrageous.

182.   Defendant's conduct was intentional or reckless.

183.   Defendant's conduct caused Plaintiff to suffer severe emotional distress accompanied by physical manifestations of said distress (such as headaches, nausea, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

### COUNT III – PENDENT STATE CLAIM
### NEGLIGENT INFLICTION OF EMTIONAL DISTRESS

Paragraphs 1 through 183 and it subparts are incorporated by reference as if stated in full herein.

184.   Defendant deliberately supported the perpetrator.  Five of defendant's employees wrote letters on BJD's behalf to the Judge overseeing BJD's criminal conviction for CSC 3rd, completely disregarding the devastating impact this would have on Plaintiff, the victim.

185.   Defendant deliberately refused to protect Plaintiff from her rapist.  Even after learning of the criminal rape allegation, Defendant refused to suspend or expel BJD, or take any disciplinary measures whatsoever, allowing him to freely access any part of the school.

186.   This resulted in Plaintiff having to see her rapist every day at school, having him follow her, brush up against her, whisper to her, and terrorize her.

187.   Defendant also allowed BJD to attend extra-curricular activities even though Plaintiff's parents had asked that he not be allowed to do so.

188.   Thus, Plaintiff did not attend such activities denying her the opportunity to socialize and enjoy such events as a normal teenager would have done.

189.   Defendant, a school whose premise is to provide an education based on Christian principles, chose to ignore the agony of a rape victim in favor of the rapist, while providing the rapist with accommodations to continue his education.

190.   Even after the Judge in the criminal matter ordered that BJD was not to be on school grounds, Defendant deliberately refused to protect Plaintiff from her rapist.

191.   Once BJD was charged and pled guilty to CSC 3rd degree, Holland Christian again refused to suspend him or expel him or impose any disciplinary measures whatsoever.

192.   Holland Christian allowed BJD to attend all off campus extra-curricular events.

193.   Holland Christian chose to accommodate BJD by sending tutors to his home while flagrantly disregarding Plaintiff 's academic difficulties.

194.   Defendant failed to notify Plaintiff of her Title IX rights, failed to provide any protections or accommodations, and failed to conduct an internal investigation, all in violation of federal law.

195.   Defendant's conduct would naturally and probably result in emotional distress.

196.   Defendant's conduct did cause Plaintiff to suffer severe emotional distress accompanied by physical manifestations of said distress (such as headaches, nausea, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

## COUNT IV – PENDENT STATE CLAIM
### NEGLIGENCE

Paragraphs 1 through 196 and its subparts are incorporated by reference as if stated in full herein.

197.   At all relevant times, Defendant owed Plaintiff a duty to provide a safe and appropriate environment for Plaintiff to learn and to receive the benefits of an education provided by Defendant.

198.   Defendant failed to provide a safe and appropriate environment for Plaintiff:

a.   When Defendant failed to protect Plaintiff from her rapist on school grounds, extra-curricular events or at school sponsored events and activities.

b.   When Defendant failed to comply with Title IX federal law: Defendant did not conduct an internal investigation, did not notify Plaintiff of her Title IX rights, protections and accommodations, and did not actively implement any accommodations or protections for Plaintiff.

c.   When Defendant failed to expel or suspend JD or implement any disciplinary measures to prevent his proximity to Plaintiff while on school grounds, extra-curricular activities or at school sponsored events, thus subjecting Plaintiff to

her attacker each day, having him follow, having him brush up against her, having him mutter to her under his breath.

199.    Defendant's conduct exhibited reckless indifference to, and/or disregard of, the foreseeable risks of harm to Plaintiff.

200.    As a direct and proximate cause of Defendant's violation of its duty to Plaintiff, Plaintiff suffered, and continues to suffer, severe emotional distress accompanied by physical manifestations of said distress (such as headaches, nausea, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

## COUNT V – PENDENT STATE CLAIM
## BREACH OF CONTRACT

Paragraphs 1 through 200 and its subparts are incorporated by reference as if stated in full herein.

201.    Plaintiff's parents entered into a contract with Defendant by enrolling Plaintiff in Defendant schools when Plaintiff was in elementary school.

202.    Said contract was an on-going contract.

203.    Plaintiff's parents paid Defendant tuition as consideration in exchange for Defendant providing Plaintiff with an education.

204.    By enrolling Plaintiff at Defendant's school and paying Defendant tuition, and by Defendant accepting Plaintiff as a student and accepting tuition, the parties each agreed to abide by the policies and conduct as set forth in the Defendant's bylaws and Student Handbook and Community Code as well as any applicable law.

205.    Plaintiff is a third-party beneficiary of said contract.

206.    Defendant breached said contract when it failed to provide a safe and appropriate
        environment for Plaintiff.  Defendant failed to abide by its own bylaws and disciplinary
        policies and failed to abide by federal law regarding Title IX.

207.    Plaintiff suffered emotional distress, psychological damages, physical manifestation of
        psychological distress, humiliation, loss of self-esteem, loss of enjoyment of life, loss of
        future earnings, and past and ongoing medical expenses, and loss of tuition because of
        Defendant's breach of contract and failure to provide Plaintiff with a safe and appropriate
        learning environment for her education.

**WHEREFORE**, Plaintiff respectfully requests judgment in her favor and against Defendant as
follows:

> A.  Compensatory damages for Plaintiff's psychological and emotional distress,
>     physical manifestation of emotional distress, embarrassment, loss of self-esteem,
>     humiliation, loss of enjoyment of life, prevention of obtaining full enjoyment of
>     life, loss of earnings past, present, and future, loss of earning capacity, past, present,
>     and future expenses for medical and psychological treatment and therapy;
>
> B.  Punitive damages;
>
> C.  Injunctive relief requiring Defendant to take effective steps to prevent sex-based
>     discrimination and harassment, including sexual assault, in all its programs and
>     activities; fully investigate conduct that may constitute sex-based harassment
>     and/or sexual assault; mitigate the effects of harassment and/or assault including by
>     eliminating any hostile environment that may arise from or contribute to it.
>
> D.  Actual damages for tuition paid to Defendant.
>
> E.  Statutory interest;

27

F.  Costs;

G.  Reasonable attorney fees;

H.  Such other relief as the court deems appropriate.

## JURY DEMAND

Now comes Plaintiff by and through her attorneys, Karen Truszkowski and Julie A. Jacot,

and demands a trial by jury.

DATED: April 10, 2018

/s/ *Karen Truszkowski* (P56929)
Karen Truszkowski
Temperance Legal Group PLLC
503 Mall Court #131
Lansing, MI  48912
1-844-534-2560 phone  / 1-800-531-6257  fax
Karen@temperancelegalgroup.com

/s/ *Julie A. Jacot* (P43443)
Julie A. Jacot
Jacot Law PLLC
1044 N. Irish Road, Suite A
Davison, MI  48423
810-653-9526 phone
810-658-2444 fax
juliejacotlaw@gmail.com

*Attorneys for Plaintiff*